# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF WEI TUNG LAM | CASE NO. 1:08-mj-247 GSA<br><br>CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT |

## I. INTRODUCTION

This is an extradition proceeding pursuant to 18 U.S.C. § 3184 in which Belgium, through the United States (Hereinafter, "Government"), seeks the extradition of Wei Tung Lam (Hereinafter, "relator" or "LAM"). The extradition request is based upon a 1997 treaty entered into between the United States and the Kingdom of Belgium. Belgium requests LAM's extradition for crimes including breaching the law on customs and excise, forgery and use of forged documents, association of criminals, and money laundering.

On September 25, 2008, a complaint for provisional arrest of LAM was filed by the government. (Doc. 2). Acting on the complaint, this Court issued a warrant for the provisional arrest of LAM under 18 U.S.C. § 3184 and Article 10 of the Treaty. Doc. 1. After the arrest of LAM on the provisional warrant, he was arraigned before the Court on Oct. 1, 2008, and ordered detained. (Doc. 7). On February 27, 2009, the government filed a "Memorandum of Law In

Support of Extradition" which contained supporting documents required under the treaty. (Doc. 22). LAM filed an Opposition to Extradition on February 27, 2009, as well as a Reply filed on March 13, 2009. Docs. 21and 23. On March 18, 2009, the government subsequently filed a Reply with accompanying exhibits to LAM's oppositions. Docs. 26 and 27.

On March 24, 2009, an extradition hearing was held.[1] LAM personally appeared and was assisted by his attorneys Dennis P. Riordan, Gary Dubcoff, and Donald Hogan, who appeared telephonically. Assistant United States Attorney, Stanley A. Boone, personally appeared on behalf of the government. At the hearing, the Court admitted government's exhibits numbered 1, 2, 3, and 4 into evidence and ordered that the parties file supplemental briefing. Both parties filed their briefs on April 13, 2009. Doc. 30 and 31.

On April 21, 2009, a further hearing was held. LAM and his attorneys Dennis Riordan and Donald Hogan were personally present. Assistant United States Attorney, Stanley A. Boone, appeared on behalf of the government. Upon consideration of all of the filings, evidence, and arguments presented, the Court finds that Wei Tung Lam is extraditable for the all the offenses requested except for the offense of money laundering, and certifies this finding to the Secretary of State as required under Title 18 U.S.C. § 3184.

## II. LEGAL STANDARD

The Court's inquiry at an extradition hearing is to determine the following: (1) whether the undersigned judicial officer is authorized to conduct the extradition hearing; (2) whether jurisdiction lies; (3) whether there is an extradition treaty in full force and effect between the requesting state (Belgium) and the requested state (United States); (4) whether the crimes alleged in the charging instrument are covered by the treaty; and (5) whether competent legal evidence amounting to probable cause establishes that there is good reason to believe that the extraditee committed the crimes alleged. Ornelas v. Ruiz, 161 US 502, 510 (1896); Zanazanian v. United States, 729 F. 2d 624, 626 (9th Cir. 1984).

If the court determines that all the requisite elements have been met, the findings are incorporated into the certificate of extraditability. The certificate is forwarded to the Department

---

[1] Mr. Lam was assisted by a Cantonese interpreter at all of the hearings.

of the State. The Secretary of State makes the final decision on whether to surrender the respondent. 18 U.S.C. § 3186.

### III. DISCUSSION

A. <u>Requirements for Extradition</u>

    *1. Authority of the Judicial Officer*

    Pursuant to 18 U.S.C. § 3184 and Eastern District of California Local Rule 72-302(b)(8), a magistrate judge is authorized to conduct an extradition hearing. Therefore, this requirement is met.

    *2. Jurisdiction Over the Individual Sought*

    LAM is currently in custody in the Eastern District of California. Accordingly, this Court has personal and subject matter jurisdiction over him. <u>See</u>, In re Pazienza, 619 F. Supp. 611, 616-18 (S.D.N.Y. 1985). LAM has not challenged this requirement.

    *3. Validity of the Treaty*

    On February 27, 2009, the government filed a declaration of David O. Buchholz, an Attorney Adviser in the Office of the Legal Adviser for the Department of State, which certifies that there is a valid extradition treaty in force between the United States and Belgium. Declaration of David O. Buchholz, dated December 23, 2008, Gov't. Exh. #2; <u>See also</u>, Doc. 22-3. A copy of the treaty is attached to Mr. Buchholz's declaration. Id. Accordingly, the Court takes judicial notice that there is an extradition treaty in full force and effect between the United States and the Kingdom of Belgium which was signed at Brussels on April 27, 1987, and entered into force on September 1, 1997. (Hereinafter, "Treaty").

    *4. Treaty Coverage*

    On February 27, 2009, the government filed the extradition request and accompanying documents including an International Arrest Warrant and texts of the applicable Belgian penal codes. (Doc. 22-2).[2] These documents indicate that Belgium requests the extradition of LAM

---

[2] The court finds that these documents comply with the requirements of 18 U.S.C § 3190 as the declaration of David Buchholz certifies that Sam Fox, the Ambassador of the United States at Brussels, was the principal diplomatic officer of the United States in Belgium at the time of his certification.

3

for the following crimes:

    a.    "breaching the law on customs and excise" (smuggling of cigarettes) pursuant to articles 220, 250 and 281 of the law on customs and excise). The punishment for this offense is imprisonment of four months to one year;

    b.    "forgery and use of forged documents" pursuant to articles 193, 196, 197, 213 and 214 of the penal code. The punishment for this offense is imprisonment of five to ten years;

    c.    "association of criminals" pursuant to articles 322 to 326 of the penal code. The punishment for this offense is imprisonment of two to five years;[3] and

    d.    "money laundering" pursuant to article 505 of the penal code. The punishment for this offense is imprisonment of fifteen days to five years.
Gov't Exh.# 1, Extradition Request at pg. 7 ¶ 4; Doc. 22-2 pg. 32.

As a preliminary matter, Article 2 of the extradition treaty requires that only offenses which carry a punishment of *more than one year* qualify for extradition. Article 2 § 2. The treaty further provides that if extradition is granted for an offense which carries a punishment of *greater than one year*, then extradition shall also be granted for any offense specified in the request even if the latter offense *is punishable by less than one year's* deprivation of liberty. Article 2 § 5(a). Finally, Article 2 provides that attempts, accomplices, associations of wrongdoers and conspiracies to commit qualifying offenses are also extraditable offenses. Article 2 § 3.

All of the crimes listed above are punishable by more than one year except breaching the law on customs and excise. Thus, LAM would only be extraditable for this offense if he is extradited on at least one of the remaining offenses listed above. Furthermore, the Belgium government clarified in a letter dated December 31, 2008, that the offense of association of criminals applies to all of the underlying offenses to which LAM is prosecuted.[4] Letter from Erik Verbert, Deputy Legal Adviser, Federal Public Service, dated December 31, 2008 ("Verbert

---

[3] Although the extradition requests indicates that the penalty for association of criminals is five to ten years imprisonment, the Belgium government later clarified that because of the penalty ranges of the underlying offenses, the penalty range for association of criminals is two to five years. Compare, Gov't Ex. 1, Extradition request at pg. 7 and Doc. 22-2 at pg. 32 with Gov't Exh. #4 at pg. 2.

[4] Prior to the government's supplemental filing, LAM argued that since there is no evidence that he committed the crimes of forgery or money laundering himself, he can only be guilty of these offenses based on a theory of vicarious liability. He further argued that because the government did not provide the text of the law on vicarious liability he cannot be extradited for those crimes. The court rejects this arguments given Belgium's clarification that association of criminals relates to all offenses. The text defining the offense of association of criminals has been provided. Gov't. Exh. 1, Extradition Request at pgs. 9-10; Doc. 22 at pg. 34-35.

4

Letter"). Gov't. Exh. #4 at pg. 1 at ¶ 1; Doc. 27. The penalty for association of criminals is imprisonment for two to five years when charged in conjunction with the other crimes outlined in the extradition request. Id. and Article 323. It is further noted that because the forgery offense carries the greatest penalty of five to ten years, the penalty for the other crimes will be absorbed into that the forgery offense. Gov't. Exh. #4, Verbert Letter at pg. 2, ¶ 8; Doc. 27.

Moreover, although the extradition documents indicate that LAM is charged with all of these crimes, the government subsequently clarified that LAM is only wanted for questioning regarding these offenses. LAM has argued that since no charges are pending against him, extradition should be denied on that basis. He relies on Article 1 of the treaty which requires that the "Contracting States agree to extradite to each other ... persons who have been *charged with* or found guilty of an extraditable offense ... ." Article 1. However, this requirement must be examined with the understanding that Belgium's criminal system is an inquisitorial one. See, Gov't. Exh. 3 and Doc. 30 at pgs. 6-8. In Belgium, Magistrate Jean-Claude Van Espen issued an International Arrest Warrant for LAM for investigative purposes which is a cognizable "charge" under the laws of Belgium as indicated in the International Arrest Warrant. Govt's Exh. 2 and Doc. 22-2 at pgs. 11-20. Further, several courts including the Ninth Circuit have upheld extradition for such investigatory purposes. See, Emami v. United States District Court, 834 F. 2d 1444, 1448-1449 (9th Cir. 1987) (allowing extradition to West Germany when extraditee was wanted for investigative prosecution); See also, In re Assarsson, 635 F. 2d 1237 (7th Cir. 1980) (formal charges need not be filed in order to extradite when language in U.S.-Swedish Treaty applied to persons "charged with or convicted of any offenses specified in article II"); Kaiser v. Rutherford, 827 F. Supp. 832, 834 (D.C. 1993) quoting Emami v. United States District Court, 834 F. 2d at 1444. (the "requirement that [a] party be charged with an offense simply requires that a party must be accused of a crime and does not require any particular technical stage of foreign criminal procedures."). Therefore, LAM's argument to deny extradition on that basis fails.

In addition to the above, LAM attacks the extradition request based on the government's failure to comply with several of the Treaty's requirements. The Court will address each of these

arguments separately as set forth below :

a) LAM argues that the Treaty requires the submission of "the text or statement of the provisions of law describing the punishment for the offense" and Belgium failed to provide such text for the offenses of forgery and use of forged documents.

Under Article 7, a request for extradition must be supported by:

a. The *text* of the law describing the essential elements of the offense for which extradition is requested. Art. 7 § 2 (c);

b. The *text* of the law describing the punishment for the offense. Art. 7 § 2(d));

c. The *text or a statement* of the provisions of law describing any time limit on the prosecution or the service of the sentence…" Art. 7, § 2(e). Government Exhibit 2; Doc. 22-3 at pg.13-14.

Although this information was left out of the government's initial extradition request, the text and punishment for this offense was later supplied by way of supplementary information.[5] Gov't. Exh. 3, question 2; See also, Doc. 30 at pg. 6. The court notes that although LAM has argued that it is not clear that the supplementary information is indeed the text of Article 196, the government of Belgium specifically states, "The complete language of [A]rticle 196 is the following ... ."[6] Id. The Court interprets this statement to mean that the full text has been provided. Even if the complete text was not provided, extradition would not be denied by this oversight as extradition treaties necessarily must be construed liberally to achieve their purpose of providing for the surrender of fugitives to the requested countries. Extradition of Ribaudo, 2004 WL 213021, at * 10 (S.D.N.Y. Feb. 3, 2004). Courts should not insist upon adherence to treaty requirements beyond the requirements of safety and justice. Id. To require more than what has been provided by the government would place form over substance and go well beyond the requirements of safety and justice. Hence, the Court finds that this Treaty requirement has been met.

b) LAM also argues that the text of the provisions of law describing the time limit on

---

[5] The government contends that this omission was due to a mistake caused by the translator's failure to include the test of the punishment provision in the translation.

[6] Article 196 defines the offenses of forgery and use of forged documents.

6

prosecution must be submitted. However, in the extradition request, the prosecutor did so only with respect to forgery and use of forged documents and association of criminals. LAM asserts that Belgium failed to fulfill its treaty obligations with respect to the statute of limitations as to the other two offenses.

As noted above, information regarding the statute of limitations can be provided in the form of text or statement. Art. 7 § 2(e). The extradition request references association of criminals and the forgery offenses indicating that the time limitation to institute criminal prosecution would end in 2015. Gov't. Exh. # 1, Extradition Request at pgs. 11-12; Doc. 22-2 at pgs. 36-37. Since the government of Belgium has indicated that association of criminals applies to all offenses, this requirement is met. Gov't. Exh. #4 Verbert Letter at pg. 1, ¶ 1; Doc. 27.

c) Finally, LAM contests his extradition on the money laundering offense on the basis of dual criminality under Article 2 of the Treaty which requires that the offense for which extradition is sought be criminal under both United States and Belgium law. Specifically, he argues that the crime of money laundering in Belgium is directed solely to goods and not on the proceeds of specified criminal activity that is required under the United States money laundering statute. See, 18 U.S.C. § 1956. Since there is no requirement that the proceeds of the money come from criminal activity in Belgium, the dual criminality provision of the Treaty is not met.

It should be noted that the principle of dual criminality does not demand that the laws of the surrendering and requesting states be carbon copies of one another. Thus, dual criminality will *not* be defeated by differences in the instrumentalities or in the stated purposes of the two nations' laws. Peters v. Egnor, 888 Fed.2d 713, 719 (10th Cir 1989). By the same token, the counterpart crimes need not have identical elements. Matter of Extradition of Russell, 789 Fed.2d 801, 803 (9th Cir. 1986). Instead, dual criminality is deemed to be satisfied when the two countries' laws are substantially analogous. Oen Yin-Choy v. Robinson, 858 F. 2d 1400 (9th Cir. 1988). Moreover, in mulling dual criminality concerns, courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable. Casey v. Department of State, 980 Fed.2d 1472, 1477 (D.C. Cir. 1992).

The court has examined the money laundering provisions of each country and has

determined that the requirement of dual criminality is met notwithstanding the fact that Belgium law does not require proof of specified criminal activity. There is no requirement that the Belgian crime be identical to a comparable American offense, only that the underlying act be punishable under both legal systems. See, Collins v. Loisel, 259 U.S. 309, 312 (1922). ("[T]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability shall be coextensive, or in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions."); See also, Cucuzzella v. Keliiloa, 638 F. 2d 105, 108 (9th Cir. 1981); Oen Yin-Choy v. Robinson, 858 F. 2d at 1405 citing Emami v. United States District Court, 834 F. 2d at 1450. (same).

        5.    *Probable Cause*

The majority of LAM's arguments relate to an alleged lack of probable cause to support the charges. A central function of the magistrate judge in an extradition proceeding is not to determine guilt or innocence, but to determine whether probable cause exists to hold the extraditee for trial in the requesting state. Escobedo v. U.S., 623 F. 2d 1098, 1102 n. 5 (5th Cir. 1980). A magistrate's function in making this determination is to ascertain whether there is "any" evidence establishing reasonable or probable cause. U.S. ex rel Sakaguchi vs. Kaulukukui, 520 Fed.2d 726, 730-731 (9th Cir 1975).

The admissibility of evidence in extradition matters is controlled by 18 U.S.C. § 3190. The Federal Rules of Evidence do not apply. Fed. R. Evid. 1101(d)(3). The standards for determining whether probable cause is established are the same as those set forth in Rule 5.1 of the Federal Rules of Criminal Procedure. In re Extradition of Neto, 1999 WL 627426, at *3 (S.D.N.Y. Aug. 17, 1999). Thus, the government need only present competent legal evidence to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. In determining if probable cause exists, the Court can look to the "totality of circumstances." Illinois v. Gates, 462 U.S. 213, 238 (1983). In other words, the Court must simply decide whether the evidence permits a reasonable belief that the person whose extradition is sought committed the crime. In re Ribaudo, 2004 WL 213021 at * 5 citing Austin v Healy, 5 F. 3d 598, 605 (2nd Cir 1993)). This standard looks to whether there is a fair

probability of guilt. Illinois v. Gates, 462 U.S. at 238. As explained by the Supreme Court in Illonis v. Gates, a probable cause or fair probability decision does not trigger an analysis based on finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence. Illinois v. Gates, 462 U.S at 235, 238-239.

Moreover, under 18 U.S.C. § 3190, hearsay is admissible. Simmons v. Braun, 627 Fed.2d 635, 636 (2nd Cir 1980). The Court may even rely on unsworn statements of absent witnesses. Id. Although caution must be exercised when hearsay is derived from unsourced statements Extradition of Joseph Ben-Dak, 2008 WL 1307816 at *4 (S.D.N.Y. April 11, 2008), the Ninth Circuit has held that even police reports which summarize the statements of witnesses are competent evidence. Zanazanian v. U.S. 729 F. 2d at 627-628.

    a. *Application of the Probable Cause Standard to the Charges*

        i. Breaching the law of customs and excise

This charge alleges that LAM illegally smuggled counterfeit cigarettes into the country of Belgium without paying the proper taxes in violation of Articles 220, 250 and 281 of the code on customs and excise.[7] A brief summary of the facts supporting this charge as outlined in Government's Exhibits 1 and 3 are as follows:

Since 2005, the Belgium customs services have been facing a large amount of trafficking of contraband cigarettes. The initial facts under investigation began in September 2005, when Belgium customs received information that a ship, identified as CSCL Shangai, would be arriving from China in the port at Antwerp on September 23, 2005. The ship would be carrying 850 parcels of bamboo articles with a destination of a company in Belgium. Belgium officials suspected this company was engaged in criminal activities.

The ship was placed under surveillance from September 23 through September 28,

---

[7] The relevant text of these provisions is as follows:

Article 220 § 1
All captains of vessels, boatman or owners of any vessel whatsoever, carriers, drivers, porters, and all other persons who, on entering or exiting, attempt to avoid making, either at the first, or at any other office where this should take place, the required declarations, and thus seek to defraud the rights of the public treasury, all persons on whose property shall be found goods prohibited by the laws in force, shall be punished by a period of imprisonment of at least four months and a maximum of one year.

2005. Belgium customs agents inspected this cargo upon its arrival in Antwerp's harbor. The container was loaded on a truck which traveled to Brussels. Once the cargo reached Brussels, customs officials observed an individual later identified as BARRIE Alpha Mamadu (Hereinafter,"BARRIE") transporting the suspected illegal cargo in a truck. The truck was driven to a warehouse where the cargo was unloaded and stored.

Belgium customs officials inspected the container and determined that the cargo contained counterfeit cigarettes which were fitted with presumed false Belgium fiscal strips. The Central Office for the Suppression of Counterfeit Goods later confirmed the strips were indeed false. These fiscal strips are the official seals which attest that taxes and excises have been properly paid. As a result, on September 28, 2005, BARRIE was charged by the Examining Magistrate as an offender or accomplice of forgery, use of forged documents, association of criminals, and breaching the law on customs and excise.

On September 27, 2005, prior to the seizure of goods, BARRIE was videotaped at a storage facility located in Shurgard, a suburb of Brussels. The videotape reveals that BARRIE was accompanied by an oriental man with black hair that was combed back and parted in the middle. BARRIE identified this individual as "Mister Unit." BARRIE indicated that "Mr. Unit" was his principal and that "Mr. Unit" asked BARRIE to wait for the arrival of a container.

Subsequently, customs officials searched BARRIE'S house which revealed a business card with the name "TONY LAM" on it. Police officers at the airport in Brussels who had seen LAM during an encounter in 2003 were shown a photograph of "Mr. Unit" which was captured on the warehouse tapes from the September 27, 2005 surveillance. Those police officers were able to identify "Mr. Unit" as LAM based on this previous 2003 encounter with LAM. This encounter is outlined in more detail below. Supplemental information provided by the Belgian government indicates that LAM asked BARRIE to wait for the arrival of the cargo of cigarettes on September 28, 2005 in Brussels. BARRIE was to bring the container to a warehouse in Shurgard. BARRIE was arrested at the Shurgard location a few minutes after the arrival of the same container. Therefore, the seized container is the same one LAM discussed with BARRIE. Statement of Paul Gerard, Deputy Attorney in Brussels, Gov't. Exh. #3 at question # 5. Based on

these facts, the Court finds that probable cause exists as to this charge.

      ii.      Forgery and use of forged documents

This charge alleges that LAM committed forgery and used forged documents in violation of Articles 193, 196, 197, 213 and 214 of the penal code.[8] From the facts summarized above, the Court finds that probable cause exists as this charge. This is supported by the fact that the cargo was examined by customs officials and determined to contain false fiscal strips.

      iii.     Association of criminals

LAM is also charged with association of criminals in violation of Articles 322 to 326 of the penal code.[9] Again, from the facts summarized above, the Court finds that probable cause exists as this charge. It may reasonably be inferred from the facts set forth above that BARRIE was a co-conspirator of LAM in the two charges above. This is true even if BARRIE denies knowledge of the illegal contents of the container or the illegal nature of his activity. There is

---

[8] The relevant texts of these provisions are as follows:

Article 193
Forgery in writings and telegrams, with fraudulent intention or with purpose of harming is punishable in accordance with the following articles :

Article 196
Are punished with imprisonment of five to ten years any other person committing forgery in authentic and public writings and any person committing forgery in commercial, bank, or private writings.
Either by false signatures,
Either by copying or counterfeiting writings or signatures ...

Article 197
In every case mentioned in this article, any person making use of the false deed or false document, is punished as if he were the offender of the forgery.

Article 213
The enforcement of the punishments, issued against any person using copied, falsely drawn up or forged coins, shares, interest or dividend coupons, notes, stamps, seals, brands, wires and documents, only takes place to the extent that these persons use this forgery with fraudulent intention or with the purpose of harming.

[9] The relevant texts of these provisions are as follows :

Article 322
Any association with the intention of committing an assault on persons or their possessions, is a crime or an offense, existing by the mere fact of organizing the gang.

Article 323
If the association intends to commit crimes ... .They will be committed to imprisonment of two to five years if the association has been founded to commit other crimes....

sufficient circumstantial evidence outlined above linking these two men to the offenses. Additionally, despite his statements that he was unaware of the contents of the container, BARRIE was charged with forgery, use of forged documents, association of criminals, and breaching the law on customs and excise.

    iv.    Money laundering

Finally, LAM is charged with money laundering in violation of Article 505 of the penal code.[10] In addition to the facts set forth above, the government relies on the following facts to support the money laundering charge:

On May 29, 2003, approximately 900 000 EUR and 350,000 USD was seized by Belgium customs officials from an individual presumed to be LAM's sister-in-law. Due to the fact that there was insufficient evidence at the time, this money was returned directly to LAM after he claimed it. Subsequently, LAM was implicated in two American proceedings for the smuggling of illegal goods including branded shoes, purses and textiles. One of these proceedings occurred in Tucson, Arizona, and the other case was in Long Beach, California.[11] The government of Belgium argues that LAM's connection to these two cases lend support for the existence of his involvement in a criminal organization specializing in smuggling and counterfeiting of cigarettes

---

[10] The relevant text of this provisions is as follows:

Article 505
To imprisonment to fifteen days to five years ... or to only one of these punishments is [sic] committed :

1.    Any person receiving goods or a part of it that have been taken away, misappropriated or obtained through a crime or offense;

2.    Any person having brought, received in exchange or received for nothing, having taken possession, in keeping or under supervision, goods intended in article 42 3although he knows or was suppose to know their origin;

3.    Any person having modified or handed over the goods intended in article 42, 3, with the intention of hiding or disguising their illegal origin or helping a person involved in an offense giving origin to these goods to evade the legal consequences of his deeds;

4.    Any person having received or concealed the nature, origin, location, larceny, relocation of the property of the goods intended in article 42, 3 although he knew or was suppose to know their origin ... .

[11] The proceeding in Tucson Arizona resulted in the filing of an indictment in the United States District Court, District of Arizona, charging LAM with violations of customs related offenses. Doc. 21 at Ex. 4. The proceeding in Long Beach, California was only an investigation and to date, charges have not been filed in that case.

and other goods presumably dating back to 2003. For this reason, Belgium authorities now request the extradition of LAM so that he can be questioned about the possible links between the United States matters in Tucson and Long Beach, and the 2003 detention of money at the Belgium airport. Statement of Paul Gerard, Deputy Attorney in Brussels, Gov't. Exh. # 3, question # 4.

As a preliminary matter, the government of Belgium has not identified which subsection of Article 505 serves as the basis for the extradition request. It is noted that three of the paragraphs of Article 505 which criminalizes the offense of money laundering references Article 42 which limits the scope of these paragraphs to certain goods. However, the text of article 42 has not been provided so the scope of these provisions are not clearly defined.

Even assuming LAM's conduct is encompassed within the definitions outlined in Article 42, given the standards regarding probable cause set forth above, the Court can only conclude that probable cause is lacking. Although it appears that LAM may be involved in the criminal smuggling of goods, after drawing all inferences in favor of the extradition request, sufficient facts have not been provided to establish probable cause even under the more relaxed "fair probability" standard announced in Illinois v. Gates. Without additional facts linking the funds seized in 2003 from LAM's sister-in-law which were later reclaimed by LAM, there is only an inference provided that these monies were obtained from illegal activity. However, this court is required to find more than a mere inference in order to find probable cause and order LAM extradited on this charge.

### IV. CONCLUSION

Based on the foregoing, the Court concludes the following:

1) Wei Tung Lam is extraditable for the offenses of breaching the law on customs and excise, forgery and use of forged documents, and association of criminals. However, LAM is not extraditable for the offense of money laundering for the reasons stated above. The Court certifies this finding to the Secretary of State as required under Title 18 USC sec. 3184;

2) IT IS ORDERED that a certified copy of this Certification of Extraditability be delivered by the Clerk to Assistant United States Attorney, Stanley A. Boone, for transmission to

the Secretary of State; and

       3) IT IS FURTHER ORDERED that Wei Tung Lam be committed to the custody of the United States Marshal for this district pending final disposition of this matter by the Secretary of State and the arrival of agents of the requesting state, at which time the extraditee will be transferred to the agents of the requesting state for return to Belgium.

    IT IS SO ORDERED.

    **Dated: May 12, 2009**             **/s/ Gary S. Austin**
                                                   UNITED STATES MAGISTRATE JUDGE